# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| LBH Engineers, LLC, | |
| Plaintiff, | |
| v. | CASE NO. 1:19-cv-04477-LMM |
| Archer Western Contractors, LLC, Archer Western Construction, LLC, Hubbard Construction Company, Northwest Express Roadbuilders, Parsons Corporation, Parsons Transportation Group Inc., and Heath & Lineback Engineers, Inc., | |
| Defendants. | |

## **DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF**

## <u>TABLE OF CONTENTS</u>

**Page**

I.   NATURE AND STAGE OF THE PROCEEDINGS ....................................1

II.  BACKGROUND OF THE TECHNOLOGY ...................................................2

III. CLAIM CONSTRUCTION PRINCIPLES ....................................................2

    A.   The intrinsic evidence is the most significant source of the
            meaning of a disputed claim term. ................................................................3

    B.   Extrinsic evidence can never be used to contradict intrinsic
            evidence. .................................................................................................6

IV.  DEFENDANTS' PROPOSED CONSTRUCTIONS ......................................7

    A.   "inverted-T beam" .................................................................................7

          1.   Defendants' construction is its plain and ordinary meaning,
                supported by the intrinsic evidence. .......................................................8

          2.   LBH's construction is litigation-inspired and should be rejected.
                .................................................................................................15

    B.   "prefabricated structural concrete beam" ................................................18

          1.   Defendants' construction is the plain and ordinary meaning, and
                is supported by the intrinsic evidence. ...................................................19

          2.   LBH's construction is overly narrow and should be rejected.............21

    C.   "horizontal corbel of said inverted-T beam"...........................................22

V.   CONCLUSION.............................................................................................25

Defendants Archer Western Contractors, LLC, Archer Western Construction, LLC, Hubbard Construction Company, Northwest Express Roadbuilders, Parsons Corporation, Parsons Transportation Group, Inc., and Heath & Lineback Engineers, LLC (collectively, "Defendants") submit their opening claim construction brief in accordance with the Court's Scheduling Order and LPR 6.5.

## I.    NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff LBH Engineers, LLC ("LBH") filed its Complaint [Dkt. #1] on October 4, 2019, alleging Defendants infringe claims 1-3 and 5-7 ("Asserted Claims") of U.S. Patent No. 8,578,537 ("the '537 Patent," *see* Exhibit A). LBH contends that Defendants infringe based on their respective roles in the design and construction of two bridges for the Northwest Corridor Express Lanes Project ("NWC").

The Court stayed discovery in this case pending resolution of the motion to dismiss the former State of Georgia defendants (GDOT and SRTA). Discovery opened in April 2020 after dismissal of GDOT and SRTA.

Following initial written and document discovery and the parties' respective exchange of infringement and invalidity contentions, Defendants filed their early Motion for Summary Judgment [Dkt. #115] on September 18, 2020, to invalidate the Asserted Claims of the '537 Patent. The briefing on the Motion for Summary

Judgment has concluded, and the Motion was submitted to the Court for consideration on October 26, 2020. In conjunction with that Motion for Summary Judgment, the parties briefed the appropriate claim construction for one disputed claim term: *prefabricated*. This term can be decided without the Court's consideration of the two remaining disputed claim terms presented herein.

## II.    BACKGROUND OF THE TECHNOLOGY

The technology at issue in this case concerns inverted-T beams commonly utilized as a component in the substructure of highway bridges (and used in non-roadway design as well). The nature of the technology is discussed in detail in the attached Declaration of Maher K. Tadros, Ph.D., P.E., which Defendants incorporate by reference. Ex. B, Claim Construction Declaration of Maher K. Tadros, Ph.D., P.E., at ¶¶ 30-50 [hereinafter "Tadros Decl."]. As stated in the Joint Claim Construction Statement, Defendants intend to present a technology tutorial at the claim construction hearing and may rely on Dr. Tadros at that hearing depending on the Court's preference for live testimony or printed presentations.

## III.   CLAIM CONSTRUCTION PRINCIPLES

Claim construction is a question of law reserved exclusively for the Court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996). The Federal Circuit has said that it is a "bedrock

principle" of patent law that "the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir.  2005) (*en  banc*). This Court is familiar with the application of the following claim construction principles. *See generally Bayer HealthCare Pharms., Inc. v. River's Edge Pharms, LLC*, No. 1:11-CV-1634-LMM, 2017 WL 10636890, 2017 U.S. Dist. LEXIS 225724 (N.D. Ga. May 10, 2017).

> **A.    The intrinsic evidence is the most significant source of the meaning of a disputed claim term.**

To ascertain the meaning of a term in an asserted claim, a court generally gives claim language its "ordinary and customary meaning." *Phillips*, 415 F.3d at 1312-13. This customary meaning encompasses the understanding of a person skilled in the art, in light of the "intrinsic" evidence, *i.e.*, the language of the claim itself, the patent specification, and the file history. *Id.* at 1315 (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996) ("Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language.")). Ordinarily, intrinsic evidence alone is sufficient to determine the meaning of any disputed claim terms.  *Vitronics,* 90 F.3d at 1583.

The analysis begins by looking "to the words of the claims themselves…to define the scope of the patented invention." *Id.* at 1582-83; *Markman*, 52 F.3d at 980. The words of a claim are given their ordinary, or customary, meanings as

understood from the perspective of "one of ordinary skill in the field of the invention." *Phillips,* 415 F.3d at 1313 (clarifying that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention").

While the claims define the invention, they do not stand alone. *See Phillips*, 415 F.3d at 1315; *Markman*, 52 F.3d 978 (claims are part of "a fully integrated written instrument"). For that reason, the claims "must be read in view of the specification, of which they are a part." *Markman*, 52 F.3d at 979. The specification "may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316. In other cases, the specification could "reveal an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* at 1316.

Despite this, the Federal Circuit has cautioned courts from importing a preferred embodiment (including one stated in the specification) into a claim's construction, even if it is the only embodiment in the patent. *E.g.*, *Liebel-Flarsheim v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."). Further, the disclosure of a

single embodiment in a patent does not constitute an intent by the applicant to act as their own lexicographer. *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1381 (Fed. Cir. 2008). The patentee must "clearly express an intent" to redefine the term. *Id.*

The Federal Circuit has long held that mere criticism of a particular embodiment encompassed in the plain meaning of a claim term is insufficient to rise to the level of clear disavowal of claim scope. *Spine Sols., Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1315 (Fed. Cir. 2010) (holding that even where a particular structure makes it "particularly difficult" to obtain certain benefits of the claimed invention, this does not rise to the level of disavowal of the structure).

Further, the prosecution history is defined as part of the "intrinsic evidence." *Phillips*, 415 F.3d at 1317. It consists of the complete record of the proceedings before the PTO. *Id.* The prosecution history provides evidence of how the patent examiner and the inventor understood the patent terms. *Id.* "The prosecution history constitutes a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct, such as designing around the claimed invention." *Hockerson-Halberstadt, Inc. v. Avia Grp. Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000). Thus, in construing the claim, the Court should

consider the prosecution history to determine "whether the patentee disclaimed or disavowed subject matter, narrowing the scope of the claim terms." *Nystrom v. Trex Co.*, 374 F.3d 1105, 1113 (Fed. Cir. 2004).

### B. Extrinsic evidence can never be used to contradict intrinsic evidence.

"Extrinsic evidence" refers to all other types of evidence, including dictionaries, treatises, and expert testimony, and other documents evidencing how the patentee has used the claim terms. While extrinsic evidence "can shed useful light on the relevant art," it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317. This is because "extrinsic evidence by definition is not part of the patent and does not have the specification's virtue of being created at the time of patent prosecution for the purpose of explaining the patent's scope and meaning." *Id*. at 1318. Furthermore, "undue reliance on extrinsic evidence poses the risk that it will be used to change the meaning of claims in derogation of the indisputable public records consisting of the claims, the specification and the prosecution history, thereby undermining the public notice function of patents." *Id*.

"Extrinsic evidence in general, and expert testimony in particular, may be used only to help the court come to the proper understanding of the claims; it may not be used to vary or contradict the claim language." *Vitronics*, 90 F.3d at 1584.

"Indeed, where the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no weight." *Id*. "Any other rule would be unfair to competitors who must be able to rely on the patent documents themselves, without consideration of expert opinion that then does not even exist, in ascertaining the scope of a patentee's right to exclude." *Id*. "Nor may the inventor's subjective intent as to claim scope, when unexpressed in the patent documents, have any effect." *Id*. "Such testimony cannot guide the court to a proper interpretation when the patent documents themselves do so clearly." *Id*.

## IV.   DEFENDANTS' PROPOSED CONSTRUCTIONS

Defendants present the following three disputed terms to this Court for construction:

### A.   "inverted-T beam"

This term appears in claims 1 and 2 of the '537 patent. Below are the parties' competing constructions:

| Defendants' construction | "a horizontal structural load bearing member having a uniform cross sectional shape of an upside down letter 'T' ( ⊥ ) along the entire length of said member" |
|---|---|
| LBH's construction | "beam with at least one cross section that forms the shape of an inverted-T that is capable of supporting at least a portion of a load" |

The primary difference between the two proposed constructions is whether an "inverted-T beam" is a beam having an inverted-T shape along the entire length of the beam (Defendants' proposed construction), or whether the inverted-T shape is only for a portion of a beam's length (LBH's proposed construction). As explained below, Defendants' proposed construction reflects the ordinary meaning of the term "inverted-T beam" as understood by persons skilled in the relevant art. In contrast, LBH's construction is litigation-driven, as the accused structural concrete beams of the NWC Project lack an inverted-T cross-sectional shape across the entire length of the beams (the other portions of the beams have a rectangular cross-sectional shape).

### 1. Defendants' construction is its plain and ordinary meaning, supported by the intrinsic evidence.

As explained by Dr. Tadros, a renowned expert in the field of bridge design and construction, a structural concrete beam is generally classified or named by the shape of the cross section **if** the beam is regularly-shaped or prismatic; *i.e.*, it has a consistent cross section along its entire length. Ex. B, Tadros Decl. ¶ 47. However, there is no universal standard for the appropriate nomenclature used to identify an irregularly-shaped (*i.e.*, non-prismatic) beam having variable cross-sectional shapes along its length. *Id.* Identifying non-prismatic beams by a particular shape would necessarily involve the arbitrary selection of a single geometric shape as the beam's name to the exclusion of the other shapes featured in that non-uniform beam.

Dr. Tadros explains that the term "inverted-T beam" has a well-known meaning to persons of ordinary skill in the art, specifically: "a horizontal structural load bearing member having a uniform cross sectional shape of an upside down letter 'T' ( ⊥ ) along the entire length of said member." Ex. B, Tadros Decl. ¶¶ 59-66. In other words, an "inverted-T beam" necessarily connotes a prismatic beam having the uniform shape of an inverted-T along its entire length. *Id*. By contrast, a person skilled in the art would not identify a "non-prismatic beam" (*i.e.*, an irregular-shaped or non-uniform beam having two or more cross-sectional shapes along its length) by choosing a single geometric shape as the beam's name to the exclusion of the other shapes featured in that non-uniform beam. *Id*.

This ordinary meaning is consistent with the language of the claims themselves. For example, claim 1 recites the limitation: "A structural concrete beam…said structural concrete beam is an inverted-T beam…." Ex. A, '537 Patent. Claim 2 similarly recites: "A structural concrete beam…wherein said structural concrete beam is an 'inverted-T' beam." *Id.* The claims explicitly state that the structural concrete beam **is** an inverted-T beam, not that the beam has a portion of its cross-sections in the shape of an inverted-T, as LBH contends.

The ordinary meaning also is consistent with the '537 Patent's specification. For example, the '537 Patent plainly states that "[s]tructural concrete beam 1 is

preferably an 'inverted-T' beam, as shown more clearly in FIGS. 5 and 6." Ex. A, '537 Patent at 3:7-9. Aside from the use of the term "is," discussed above, Figures 5 and 6 also are instructive. They illustrate, respectively, "a **typical** cross sectional view of **the** structural concrete support beam" (*id.* at 2:25-26) and a "cross-sectional view of the structural concrete beam…**at a support location**" (*id.* at 2:27-28):



As such, Figures 5 and 6 of the '537 Patent only illustrate a prismatic concrete beam having a "typical" (*i.e.*, uniform) cross-sectional view and the cross-sectional view at the support columns as an inverted-T shape. The specification of the '537 Patent fails to disclose non-prismatic beams (and likewise fails to disclose irregular or non-uniform beams). More importantly, the specification of the '537 Patent fails to disclose how a skilled artisan would apply the "inverted-T" nomenclature of the claims to non-prismatic, irregularly-shaped beams when such non-prismatic beams necessarily possess multiple cross-sectional shapes.

The incongruity of the Asserted Claims' "inverted-T beam" limitation to non-prismatic beams is highlighted by the '537 Patent's specification itself. The '537 Patent describes several alternative shapes for the disclosed structural concrete beam:

> It is further recognized that those of skill in the art will appreciate the various geometric configurations which may be employed in designing structural concrete beams in accordance with the present invention without limitation. By way of example, a partially prefabricated structural concrete support beam according to the present invention may be constructed having an "L" shaped cross-section, as illustrated in FIG. 9. By way of further example, a partially prefabricated structural concrete support beam according to the present invention may be constructed having a rectangular cross-section, as illustrated in FIG. 10.

Ex. A, '537 Patent at 5:21-31. Although L-shaped and rectangular-shaped beams are cited and depicted, the '537 Patent does not even hint at the possibility of multiple cross-sectional geometries in one beam. By way of example, the '537 Patent says nothing about a structural concrete beam with a portion of the beam having an inverted-T cross-sectional shape and a portion of the beam having a rectangular shape. Only now, 15 years after Dr. Ley filed his patent application, does LBH claim that Dr. Ley's claimed invention includes non-prismatic beams. And again, the specification of the '537 Patent fails to disclose how a skilled artisan would apply the "inverted-T" nomenclature of the claims to non-prismatic beams.

The prosecution history of the '537 Patent, and the estoppel that arises from it, confirms Defendants' analysis. "Prosecution history estoppel requires that the claims of a patent be interpreted in light of the proceedings in the PTO during the application process." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002). "Estoppel is a 'rule of patent construction' that ensures that claims are interpreted by reference to those 'that have been cancelled or rejected.'" *Id.* (citing *Schriber-Schroth Co. v. Cleveland Tr. Co.*, 311 U.S. 211, 220 (1940)). For example, Dr. Ley argued to the patent examiner on March 17, 2009, that different geometric beam shapes—Inverted-T, L, rectangular, *etc.*—are obvious variants of each other based on formwork placement:

> The structural concrete beam, as claimed in the present invention, comprises a prefabricated structural concrete portion, a poured-in-place structural concrete portion, and reinforcing, disregarding whether the beam is an inverted T-shaped beam, L-shaped beam, or rectangular beam. The specification of the present invention also states that "it is further recognized that those of skill in the art will appreciate the various geometric configurations which may be employed in designing structural concrete beams in accordance with the present invention without limitations" (paragraph [0032]). Applicant uses the inverted T-shaped beam, L-shaped beam, or rectangular beam as examples to illustrate that the structural concrete beam in the present invention can be constructed having different shapes, and it is obvious to see that these different shapes may be made by varying width of the poured-in-place portion compared

with that of the prefabricated portion and by varying the position of the poured-in-place portion relative to the prefabricated portion.  For example, an inverted T-shaped beam may become a rectangular beam if the poured-in-place portion of the inverted T-shaped beam spans along the width of the prefabricated portion until it has the same width of the prefabricated portion (see Fig. 5 and Fig. 10); and an inverted T-shaped beam may also become a L-shaped beam if the poured-in-place portion of the inverted T-shaped beam moves to the left side of the prefabricated portion (see Fig. 5 and Fig. 9). Therefore, the species as to shape of beam in the FIRST GROUP OF SPECIES are only obvious variants of each other, and they will not require a different field of search. There will not be serious search and examination burden to the examiner if election/restriction is not required.

Ex. C, Mar. 17, 2009 Resp. to Office Action at 9-10. At no point in his response to the Patent Examiner's office action did Dr. Ley refer to a beam having multiple cross-sectional shapes in a single beam. But even if he had, a person having ordinary skill in the art would not infer that a beam referred to in name by a single shape, such as an "inverted-T beam," would include multiple **other** cross-sectional shapes. Ex. B, Tadros Decl. ¶¶ 61-62.

It also is noteworthy and instructive for claim construction that the claims of the '537 Patent, as originally filed, *lacked* the "inverted-T beam" limitation in the independent claim. That language was added later. Indeed, on June 14, 2013, Dr. Ley amended claim 1 to include (among other changes) the "inverted-T beam" limitation in order to gain allowance:

1.   (**Currently Amended**) A structural concrete beam, comprising:

a prefabricated structural concrete portion;

a poured-in-place structural concrete portion, wherein said poured-in-place portion comprises at least ten percent of the total weight of said structural concrete beam;

wherein said poured-in-place structural concrete portion is constructed utilizing temporary formwork and wherein the prefabricated structural concrete portion is sufficiently strong to support the moment load produced by the placement of fresh concrete of the poured-in-place portion and the self-weight of the prefabricated portion itself; ~~and~~

reinforcing extending from said prefabricated structural concrete portion into said poured-in-place structural concrete portion; and

wherein said structural concrete beam is an "inverted-T" beam.

Ex. D, June 14, 2013 Claim Amend. at 2.

This amendment is important to the Court's claim construction analysis. It represents a significant change in scope to claim 1 (and the disputed term "inverted-T beam"). Prior to this amendment, any beam having a prefabricated portion and poured-in-place portion would have infringed the '537 Patent, regardless of its cross-sectional geometry. After this amendment, only those beams that also are "inverted-T beams" fall within the claim's limitation.

Dr. Ley's amendment is presumed to have been intentional, and could have been written differently and broader: "wherein at least a portion of said structural concrete beam has an inverted-T shape." Dr. Ley, however, surrendered this broader claim scope during prosecution. If an inventor limited the claims during prosecution,

the inventor cannot later "recaptur[e] through claim interpretation specific meanings disclaimed during prosecution" to overcome prior art. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1323-25 (Fed. Cir. 2003).[1] What LBH now asks this Court to do is rewrite the '537 Patent's claims after-the-fact (and in the midst of litigation) to add back something he has long-since abandoned. "It is critical to avoid allowing surrendered matter to creep back into the issued patent, since competitors and the public are on notice of the surrender and may have come to rely on the consequent limitations on claim scope." *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1331 (Fed. Cir. 2007).

### 2. LBH's construction is litigation-inspired and should be rejected.

The Court will note that the primary difference between the two proposed constructions is whether an "inverted-T beam" is a beam having an inverted-T shape along the entire length of the beam (Defendants' construction), or whether the inverted-T shape is only for a portion of a beam's length (LBH's construction).

---

[1] *See also Rheox, Inc. v. Entact, Inc.*, 276 F.3d 1319, 1325 (Fed. Cir. 2002) ("Explicit arguments made during prosecution to overcome prior art can lead to narrow claim interpretations...."); *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997) ("[S]ince, by distinguishing the claimed invention over the prior art, an applicant is indicating what the claims do not cover, he is by implication surrendering such protection.").

Defendants' construction is the right one because it is derived from the plain and ordinary meaning of "inverted-T beam." LBH's construction, however, is clearly motivated by its infringement case. This is because the accused "inverted-T beams" in the NWC Project lack a cross-sectional shape of an inverted-T along their entire length:



*See* Google Street View Images (depicting the two accused NWC Project beams), *available at* https://goo.gl/maps/ZKYeWs2tWGkr2FS86 (top image) and https://goo.gl/maps/RTpbLN16FUhm6vaP9 (bottom image).

Under the guise of claim construction, LBH urges this Court to rewrite claims 1 and 2. The reason is simple (but wrong). LBH must broaden the claim scope in order to support its claims of literal infringement.[2] Instead, LBH would be required to prove its infringement case under the doctrine of equivalents.[3]

For example, although claim 1 contains the limitation "said structural beam is an inverted-T beam," LBH's construction effectively broadens this limitation to read: "said structural beam has at least one inverted-T cross section." This rewrite results in an absurdly broad claim scope in light of the claims as they were actually written. This absurdity is evident from the fact that LBH's litigation-inspired rewrite ensnares even a rectangular structural beam with less than 1% of its length having an inverted-T cross-section.

---

[2] To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (Fed. Cir. 1990).

[3] LBH's construction improperly conflates the doctrine of equivalents into its claim construction of "inverted-T beam." "The doctrine of equivalents prevents an accused infringer from avoiding infringement by changing only minor or insubstantial details of a claimed invention while retaining their essential functionality." *Sage Prods. v. Devon Indus.*, 126 F.3d 1420, 1424 (Fed. Cir. 1997). Thus, if "the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patent[]" the patentee may show infringement even where, literally, the accused product lacks some claim limitation. *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 559 F.3d 1308, 1312 (Fed. Cir. 2009).

LBH's motives are transparent. Under the proper construction (Defendants'), LBH cannot prove literal infringement as the accused beams in the NWC project indisputably do not have an inverted-T cross section for the full length (or even more than half the length) of the beams. This is contrary to the ordinary meaning of the claim term and the intrinsic evidence. The Court should reject LBH's construction.

**B.     "prefabricated structural concrete beam"**

This term appears in claims 1 and 2 of the '537 patent. The parties' competing constructions are provided below:

| | |
|---|---|
| Defendants' construction | "structural concrete portion made beforehand" |
| LBH's construction | "structural concrete portion that is premade somewhere other than the place where the structural concrete beam is ultimately situated" |

The Parties' claim construction positions have been fully briefed in conjunction with Defendants' Motion for Summary Judgment. *See* Dkt. Nos. 115, 117, 119. Defendants provide below a distilled briefing that takes into account LBH's prior arguments.

Each of the Asserted Claims require a structural beam having a "prefabricated structural concrete portion," which Defendants assert should be construed as "**structural concrete portion made beforehand**."

### 1.    Defendants' construction is the plain and ordinary meaning, and is supported by the intrinsic evidence.

The word "prefabricate" is generally understood to mean "to fabricate or construct beforehand." Ex. B, Tadros Decl. ¶¶ 52-58. As explained by Dr. Tadros, the term "prefabricated" is not a term of art within the concrete industry. *Id.* at ¶ 55. Thus, a skilled artisan would conclude that the patentee intended for this term to have its generally understood meaning; *i.e.*, "to fabricate or construct beforehand."

Defendants' construction is consistent with the plain and ordinary meaning of "prefabricated," which has nothing to do with __where__ the concrete portion is made, but merely describes __when__ the portion is made. Referring to the language of the claims themselves, it is clear that the "prefabricated structural concrete portion" acts as the base upon which the "poured-in-place structural concrete portion" is cast.[4] Although LBH argues that the "poured-in-place" language implies that "prefabricated" cannot also be poured-in-place, this argument is unsupported by the plain language in the claims. That plain language dictates that the "prefabricated"

---

[4] *See*, *e.g*., Ex. A, '537 Patent at claim 2 ("wherein said poured-in-place structural concrete portion is constructed utilizing temporary formwork and wherein the prefabricated structural concrete portion is sufficiently strong to support the moment load produced by the placement of fresh concrete of the poured-in-place portion and the self-weight of the prefabricated portion itself;"). A fair reading of claim 2 simply does not mandate where the "prefabricated" portion is made.

portion is made first, enabling the "poured-in-place" portion to be constructed second (or later in time) on top of the "prefabricated" (made first) portion.

The '537 Patent's specification further supports Defendants' construction: **"Prefabricated concrete portion 3 of beam 1 is <u>preferably</u> constructed at an off-site facility <u>utilizing any precasting or prefabrication method</u> as are widely known in the art, or as may be later developed."** Ex. A, '537 Patent at 3:18-21 (emphasis added). The use of "preferably" confirms that such offsite precasting is merely a preferred embodiment of the '537 Patent and *not* mandated by the '537 Patent. The Federal Circuit consistently has cautioned courts from importing a preferred embodiment into a claim's construction, even if it is the only embodiment in the patent. *E.g.*, *Liebel-Flarsheim v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.").[5]

The '537 Patent does not provide any basis for concluding an intent for the meaning of the term "prefabricated" to deviate from its plain and ordinary meaning:

---

[5] Indeed, Ley expressly included all possible embodiments in his '537 Patent. *See* Ex. 1, '537 Patent at 5:38-41.

to make beforehand. There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term…." *Thorner v. Sony Comp. Entm't Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012). The patentee must "clearly express an intent" to redefine the term. *Id.* That clear expression of intent is absent in the '537 Patent. Neither the '537 Patent itself nor the prosecution history possess "expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Teleflex, Inc. v. Ficosa N. Am. Corp*., 299 F.3d 1313, 1325 (Fed. Cir. 2002). Further, the disclosure of a preferred embodiment in a patent does not constitute an intent by the applicant to act as their own lexicographer. *Helmsderfer*, 527 F.3d at 1381.

### 2.    LBH's construction is overly narrow and should be rejected.

LBH's proposed construction—"structural concrete portion that is premade somewhere other than the place where the structural concrete beam is ultimately situated"—is impermissibly narrow in light of the intrinsic evidence, as discussed above.

LBH's proposed construction is an attempt to re-write the claims of the '537 Patent, substituting the word "precast" in place of the claim term "prefabricated"

(the term used in the patent). The term "precast" is a term of art within the concrete structures industry, and it has a well-understood meaning. *See* Declaration of Dr. Tadros in Support of Motion for Summary Judgment [Dkt. #115-11] at ¶ 25. But Dr. Ley did not use the word "precast" in his claims, nor did he limit the claims to cover only beams containing portions that were "precast." Ex. A, '537 Patent at 3:18-21 ("Prefabricated concrete portion 3 of beam 1 is <u>preferably</u> constructed at an off-site facility <u>utilizing any *precasting or prefabrication method*</u> as are widely known in the art, or as may be later developed." (emphasis added)). Instead, he used the word "prefabricated." That word's plain meaning does not have *any* indication as to <u>where</u> the element discussed is made. The clear meaning is that the element is fabricated beforehand, an intentional drafting selection made presumably in order to broaden the scope of the invention. The Court should resist LBH's attempt to rewrite the claims now to *narrow* them in an attempt to avoid Defendants' invalidity attacks.

C.     **"horizontal corbel of said inverted-T beam"**

This term appears only in claim 1 of the '537 patent. The parties' competing constructions are provided below:

| Defendants' construction | "the horizontal base portion of the inverted-T beam, as construed above" |
|---|---|
| LBH's construction | No construction necessary.<br><br>Alternatively, "ledge located on said inverted-T beam that is capable of supporting at least a portion of a load" |

At first glance, LBH and Defendants propose generally the same construction for "horizontal corbel of said inverted-T beam." LBH's construction, however, is intentionally misleading and incorrect.

As an initial matter, a person having ordinary skill in the art will instantly understand the horizontal corbels of an inverted-T beam are the ledges that exist to the sides of the stem at the bottom of an inverted-T beam. Ex. B, Tadros Decl. at ¶¶ 67-69. The horizontal corbels are easily recognizable in Figure 5 of the '537 Patent:[6]

---

[6] It is noteworthy that the '537 Patent fails to use the word "corbel" even once in the specification (it is only used in a claim). Thus, the intrinsic evidence is of little other value in this claim construction analysis.



Figure 5

The problem with LBH's construction is the inclusion of the superfluous language "located on." This is undoubtedly added in an attempt to corroborate LBH's incorrect construction of the term "inverted-T beam." LBH's concept of a ledge located on an inverted-T beam is a diluted (and deluded) construction that tracks LBH's position that a non-prismatic beam with a rectangular-shaped cross section can be called an "inverted-T beam" if it has such ledges. As explained in Section IV.A., *supra*, the intrinsic evidence cannot support LBH's overly-broad construction.

Defendants respectfully request that the Court construe "horizontal corbel of said inverted-T beam," consistent with its ordinary meaning and with the ordinary meaning of an inverted-T beam, to mean: "the horizontal base portion of the inverted-T beam."

## V.     CONCLUSION

For the foregoing reasons, the Court should accept Defendants' proposed claim constructions and construe the disputed terms of the '537 Patent accordingly.

Dated: November 23, 2020

Respectfully submitted:

*/s/ Jeffrey J. Phillips*
JEFFREY J. PHILLIPS

*/s/ Andrew S. Harris*
ANDREW S. HARRIS

NEAL J. SWEENEY
Georgia Bar No. 694725
TODD M. HEFFNER
Georgia Bar No. 595870
JONES WALKER LLP
1360 Peachtree St. NE, Suite 1030
Atlanta, Georgia 30309
Tel.: (404) 870-7500
Fax: (404) 870-7501
nsweeney@joneswalker.com
theffner@joneswalker.com

JEFFREY J. PHILLIPS
*Admitted pro hac vice*
Texas Bar No. 24037279
JONES WALKER LLP
811 Main St., Suite 2900
Houston, Texas 77002
Tel.: (337) 593-7600
Fax: (337) 593-7601
jphillips@joneswalker.com

MICHAEL K. LEACHMAN
*Admitted pro hac vice*
Louisiana Bar No. 30158
JONES WALKER LLP
445 N. Blvd., Suite 800
Baton Rouge, Louisiana 70809
Tel.: (225) 248-2000
Fax: (225) 248-3154
mleachman@joneswalker.com

**Attorneys for Parsons Transportation
Group, Inc. and Parsons Corporation**

ANDREW S. HARRIS
*Admitted pro hac vice*
Mississippi Bar No. 104289
JONES WALKER LLP
190 East Capitol St., Suite 800
Jackson, Mississippi 39201
Tel.: (601) 949-4900
Fax: (601) 949-4804
aharris@joneswalker.com

Respectfully submitted:

*/s/ William Y. Klett III*
WILLIAM Y. KLETT III

WILLIAM Y. KLETT III
*Admitted pro hac vice*
GRAHAM H. STIEGLITZ
Georgia Bar No. 682047
BURR & FORMAN LLP
171 17th Street NW, Suite 1100
Atlanta, Georgia 30363
wklett@burr.com
gstieglitz@burr.com

**Attorneys for Archer Western Contractors, LLC,
Archer Western Construction, LLC,
Hubbard Construction Company, and
Northwest Express Roadbuilders**

Respectfully submitted:

/s/ Brian S. Spitler
BRIAN S. SPITLER

BRIAN S. SPITLER
Georgia Bar No. 672287
KENT T. STAIR
Georgia Bar No. 674029
COPELAND, STAIR, KINGMA & LOVELL LLP
191 Peachtree Street, NE, Suite 3600
Atlanta, Georgia 30303
bspitler@cskl.law
kstair@cskl.law

*Attorneys for Heath & Lineback Engineers, Inc.*

## CERTIFICATE OF FONT AND POINT SELECTION

Undersigned counsel hereby certifies, pursuant to LR 7.1(D), N.D.Ga., that the foregoing was prepared in Times New Roman, 14 point font, which is one of the font and point selections approved in LR 5.1, N.D.Ga.

/s/ Andrew S. Harris
ANDREW S. HARRIS

## CERTIFICATE OF SERVICE

I hereby certify that I have this day filed the foregoing document with the CM/ECF electronic filing system, which sent electronic notification to all counsel of record.

Dated: November 23, 2020

/s/ Andrew S. Harris
ANDREW S. HARRIS